Corey Zennamo v. County of Oneida Is it Attorney Zennamo? Yes, Your Honor. Good morning, sir. Good morning, Your Honor. You have reserved one minute for rebuttal. Thank you, Your Honor. Thank you. May it please the Court, the record was replete with evidence and facts establishing that the County of Oneida, directed by the County Executive, took attorney-client protected files from the Oneida County Public Defender's Office. So I have to interrupt at the beginning before you talk about the record as a whole because the failure to comply with Rule 56-1, which the District Court pointed out and which your opposing counsel pointed out, limits, in my view, what we can refer to and rely on in our analysis of your case. Your Honor, I appreciate the opportunity to address that first off. Please do. Yes. I'm very puzzled by that failure. Yes. So Rule 56-1 requires certain, it requires mirrored response to the opposition's facts. It requires numbered paragraphs. Yes. And citations to the record. Yes. And in your first submissions, you didn't have numbered paragraphs, and in your second you didn't have citations. So Your Honor, yes. So what the error here was that the paragraphs were not numbered. However, the citations did, the citations and the response did reflect on the paragraphs presented by the respondents. You understand how much more difficult this makes both for the District Court and for our court in review to identify whether there is a relevant, genuine dispute of material fact. I appreciate that, Your Honor, and I want to answer that in two ways. First, the single document, which was the additional supplemental response by the plaintiff. That included both reflection on the paragraphs of the respondent, and in addition to that, explaining exactly why the facts were different and citing to the record. So although it was a separately titled document and it wasn't perfectly numbered, I wouldn't consider it a substantive or an error in that regard. I would say that it was more of just a numbering error, and I can understand and appreciate the Court's position that it does make it more difficult. I'm not here to say that it shouldn't have been done perfectly. Was there a reason it wasn't? Your Honor, to be direct, I'm here now handling this appeal. The attorney who handled that is not here today. Yeah. But you're a lawyer. I am, Your Honor, yes. You were the client. Yes. So you had an opportunity and presumably did review the submissions, right? I did review the submissions, Your Honor, and I can only indicate that it should have been done, but I don't believe that it was such that the Court had the authorization under 56.1 to disregard all facts that were contrary. So the Court is allowed to say, I'm going to disregard certain things that were presented, but because there was direct citations in response to the respondent, and those direct citations were referencing the record, and they referenced the paragraphs, it showed a contradiction of fact that the Court had to consider. So maybe you could point us to the fact in the record that you highlighted for the District Court that was affirmative evidence that the reason you were dismissed was in retribution for speaking out about what you saw as an ethical obligation that the county was failing to adhere to. Yes, Your Honor. You mean the First Amendment issue? Yes. Okay. Yes. So, Your Honor, with regard to the First Amendment issue, first of all, I think it's very clear for everyone here, I would hope, that it's a matter of public concern when the government, who's prosecuting cases, takes files that are related — What I'm asking for is where in the record that you highlighted to the District Court is there affirmative evidence that the county fired you because you raised a matter of public concern, an ethical issue? So there's two bases, disparate treatment with other employees and a temporal link to the report. So the report was made, within a day or two it was made, of realizing that the county was obtaining those records. Thereafter, a follow-up email was made, and within two weeks, the appellant was terminated. I was terminated. The appellant was terminated, okay? And at A618, it establishes that Joanna Finer and Corrie Zanamo, we were business partners in a private firm. Ms. Finer's name was on the letterhead. Her name was signature lines on these documents that they allegedly found. She was not terminated. You're relying on inferences drawn from temporal proximity and a comparison, but no affirmative evidence that you pointed me to yet that the reason you were terminated was that you raised an ethical concern. So, Your Honor, the Second Circuit under Raymond v. City of New York does not require there to be direct evidence. It says that temporal proximity is strong circumstantial evidence, and in particular, if it's within two to three months or less, it's strong evidence of that fact. But we aren't relying just on temporal proximity, which, again, the termination was two weeks after the report of the appellant to the Public Defender's Office. But it was also two weeks after it came to light that the — that you were using it for private purposes. So — But I suppose that that would be a dispute of fact. It's — Your Honor, it is — yes, it is a dispute of fact. And, Your Honor, just to point out, there was a meeting that was held on June 24th, which is part of the record, where it was indicated that everyone in the office was theoretically using computers for things that the county didn't want, that no one would be punished or terminated as a result. The record establishes that the appellant thereafter stops using the computer because he felt that there was an ethical violation of the county looking at those records, so there was no further use at all that could be used against him. And thereafter, the county, after the report was made, where the appellant said, hey, listen, this is unlawful, this violates the Fourth Amendment, it violates ethical rules, thereafter, he was terminated. So there was a two-week period between the meeting, where they said all these things were going on and everything, no issues, only after the e-mail was sent. Could you lower your voice a little bit? I'm sorry. Yes, Your Honor. I'm sorry. Only after the e-mail was sent, within minutes, an hour or so, did the county come and say there's a virus on the computer and then take it. And I think that the fact that they alleged a virus on the computer is indicative of the fact that they knew they weren't supposed to take it. When you say he was terminated, you mean you. Me, Your Honor. I'm trying to be — yes. I thought you were talking about a different employee. I'm doing — But when it comes to your disparate treatment — Yes. — claim, you mentioned you were the only one fired, no one else. Yes. But I thought there was another employee who was fired, also for use of personal computer for, you know, the same — violation of the same policy. So that particular individual left on their own. That individual was actually representing the head public defender's son. And so that's what initiated this whole problem to begin with. So a number of public defenders were doing private work with the — Where in the record is it that he left on his own? Because I thought the record established he was fired. Yes, Your Honor. I'd have to look specifically at the record. He won — so the county indicated that he was terminated, and then they also indicated that he left on his own. My understanding is that he left on his own, that he was not terminated. Well, but your understanding isn't the record. Yes. I understand that. So where in the record it shows he was — something else happened other than he was terminated? The testimony of Frank Niebusch, who was the head public defender, was that he left on his own. That was at the — The testimony where? In the record. His deposition was included in the record. I don't know the exact citation to that section of the record. OK. And there were other people that were reprimanded for use of their computer, and the employer claimed their level of misuse was not as great. So there were other people reprimanded, correct? My understanding — and I don't know that it was specific in the record — but that people received various reprimands only for things that were done subsequent to the meeting, nothing before that June meeting. OK. When you say your understanding, again, this is your assessment of — Yes, because it wasn't in the record specifically, and I had been terminated at that point. So I did not have access to the records of those employees to know what was done subsequent. But this is summary judgment. You had discovery and testimony and depositions. And so that's not, you know — Again, Your Honor — So I'm looking to see, again, in the record, where is there evidence that they were not reprimanded for anything that happened prior? Yes, Your Honor. So I'll direct you to two locations where I think that that's important. The first, again, is at A618, where Ms. Feiner was not terminated at all. She was not reprimanded. She was my business partner. Her name was on the letterhead. Her name was on the documents that they said that they recovered and imputed on me. That's all in the record. At 618, A365, A417 to 418. The termination, A13, A29 to A30, where Ms. Feiner was not terminated, they indicate that in the record, but I was. The fact that I — I keep saying I. I think it's unprofessional, but I'll do it because the Court addressed it. The fact that I didn't use the PC after the meeting is at A121 and A123. And I think the reason that's relevant is because it's also in the record that nobody would be terminated or punished as a result of this conduct for any conduct prior to the meeting. The computer was not used subsequent to that, yet I was still terminated. And there's one other — just to address the Court's question, there was an incident that predated all of this where an individual employee accessed — and I call it the John Deere scandal — he accessed the John Deere website during the workday. And when he did so, he went to the wrong website and got a bunch of malware on the county. They had to shut down the server and delete a number of work. And they actually had to revert back. That is —  What's the relevance of that? Yes. Because he wasn't punished. So he violated what they claim to be the acceptable use policy in a severe way, in an egregious way that resulted — Egregious consequences. But he — maybe going merely to the site wasn't an egregious violation, would you agree? Correct. Yes. But it was the purpose of the APU, of their use policy, to avoid that scenario. And he violated it, and it resulted in work loss. That is in the record at A365 to 367 and A430. So there was disparate impact or disparate treatment of those employees. They were treated completely differently than I was. Can I understand better your access argument? Yes. Because I was not always — I was not clear whether you were saying the fact that someone said that they could access it or that whether — that someone actually did access it. There was the hiring of private contractors. There was some individual review. You know, sometimes it sounded as though you were saying in the abstract the notion that there might be access or there was a capability, that all of that was an ethical violation that you had a duty to report. And that applied both to your criminal clients as well as your private clients, whether they were civil or criminal. So could you — Yes. Yes, Your Honor. So I want to make it very clear for the record that Defendant Pesenti, the county executive, admitted at A418 and A419, we have access to everything on the server and access to every public defender file. So he makes a general statement that the county has access and can — could if it wanted to. But you're not saying that they actually did. Nope. Then he indicates that he took those items, copied them. And I'm just looking for the — I'm sorry. Took what items? Yep. Took all of the information from the server and from the laptop, copied it, and then transferred it to a third party. I'm just looking in the — in the record here for exactly where it's referenced. So you're noticing that the transfer to the third party, the private contractor, to look for letterhead or what have you, that that itself was an actual access that was attributable to the county and an ethical violation. So the first seizure without a warrants or without asking the public defender, let's say, that first seizure where they took the laptop and they took the data from the server, that is a Fourth Amendment violation. The government cannot just take documents, protected or not, from an attorney just because he represents indigent clients and because the government is paying for his salary. You are a county employee. And so as to some matters, they would be entitled to look at the laptop by the county, right? They would not, Your Honor. So — Not at all? Not at all. So the structure of the public defender's office is such that the head public defender works as an intermediary. But I'm talking about other matters, administrative matters, not representational matters. Yes. So, Your Honor, that's a good point. And I think that it's established ideally from a scenario where if they had obtained a warrant, let's just say for the sake of the argument, the court generally would apply a special master to review what's attorney-client protected and what's not, and then turn over anything that's not to the county. There's never a time, never a time where the county should have access to confidential files when it comes to an individual representing individual clients. I'm not a county attorney. The public defender's office is not county attorneys. And that's reflected by Supreme Court cases like Polk, Brown. And it's also reflected in the county law, which is the State Law 717, which says you represent individuals, not the municipality. And what about your — the materials with regard to your private clients? So there was nothing in the record where they indicated what those alleged materials were. Again, the — I understood from your submission that you did keep materials regarding private clients because you were entitled to practice under the understanding up until 2024 that you were entitled to use the computers. That's incorrect. Yes, Your Honor. So there was some data on the systems prior to the meeting, both — created both by myself and Ms. Feiner. That was true, but in passing. E-mail access and so on. That we had a private system entirely. After the meeting, there was no computer use period. So once the county — and that's indicated in the record. Once the county attorney — I'm sorry, the county executive said, hey, on June 24th, no more doing this. Delete everything and be on your way and there won't be any more problems. That's what — that's what was done. And that's clear, again, in A365, 417 and 418 and A121 and 123. And I just — and I just want to point out one thing, Your Honors. Again, I brought up the special master issue. You know, the bottom line is this. The government cannot access a public defender's files, period. The — the public defender, the head public defender works as an intermediary to ensure that if there's an issue, he reviews the files. I quickly understand. Okay. You're now almost 12 minutes. Sorry, Your Honor. I appreciate it. It's okay. But you've saved one minute for rebuttal. Yes. Thank you, Judge. Good morning, Your Honors. Good morning, Your Honors. May it please the Court, my name is Daniel Cartwright. I represent the defendants in this case. Your Honors, for the reasons set forth in my brief, I believe that this Court should affirm the entirety of the district court's decision in order granting summary judgment in the county and the individual defendants Pachente and Rahill. I will go through each of the points. I have five points in my brief. I'll quickly go through them. If you have any questions for me, I'd be happy to answer them. Just briefly, starting with point one of my brief, we did point out the local rule 56-1 deficiency in the plaintiff's papers. And just for context, Your Honors, when we filed our motions, both parties on the same date filed their own motions. So defendants filed a motion, plaintiff filed his own motion. Defendant's motion was in compliance with 56-1. Plaintiff's was not on the original papers. In the oppositions, I pointed out in my opposition that because the plaintiff did not comply with 56-1, the entire thing had to be denied and I didn't have to give any sort of answer to the statement of material facts because it was not in compliance with local rule 56-1. I point that out because I think it's important because it gives notice to a plaintiff who may not have complied in their original papers to raise their hand, seek leave from the court, say, hey, Judge, I made a mistake here. Can I go back and fix my papers? And I think if that would have happened, that the judge probably would have granted that. But correct me if I'm wrong. I thought the judge still accepted the first filing. It was only when in the reply filings, the same failure to comply with the rule 56.1 is what the judge said, all right, you know, you didn't fix the first problem, but I'm still going to accept it. But in the reply, you don't get that benefit. You have to fix that. And that's within the court's discretion, right? Right. So I thought you were saying that the court had the right to refuse to, which I understand the court could have refused, but the court didn't refuse to accept the first submission that was failed to comply with 56.1, correct? My point was simply going to be that it's a mandatory rule that it's supposed to be done and that the court had discretion to accept or reject the defective filings as it saw fit. It rejected some and it accepted some. It accepted some. And looking at the ones that it accepted, it appears that the plaintiff raised his concerns regarding the client confidentiality to Mr. Niebusch in person via email. Other public defenders practiced privately and used their county equipment for personal matters. Private materials were found on at least two other public defenders' computers and neither was terminated. The plaintiff said he hadn't used his work computer at all since the June 24th meeting. And Vicente said at the meeting that personal use of the county equipment before that date would result in discipline. And the plaintiff's computer was taken within hours of the email he sent to Mr. Niebusch regarding his client confidentiality concerns, even though the meeting occurred two weeks before and he was terminated shortly after. And those are among the facts and the documents that the district court said, as I understand it, he was considering. Why isn't that enough to raise an inference that he was being terminated for raising a matter of public concern? Well, I think if I have it right, Your Honor, you're touching on the First Amendment issue with the public matter of public concern. And that this would be retaliation for raising a matter of public concern. Sure, sure. Why isn't that at least a plausible claim at the motion? I guess we're on summary judgment.  I would point out as a precursor to that answer that, as Your Honors have pointed out, that the court already had a challenge of figuring out what to do with the statements and material facts to figure out what was genuinely in dispute or not based on what we filed versus what the plaintiff filed that was defective, but it decided to consider anyway. So it decided to consider the facts in which it did. Right. Those are these raised disputes, right?  But in terms of, you know, you asked if it raised a matter of public concern, and that goes to the First Amendment argument of, you know, whether these client confidentiality issues that were raised were matters of public concern. And... I do not believe they were. The court didn't reach that issue when it granted summary judgment. It said, hey, causation is good enough for us. We don't have to reach this issue of whether it's a matter of public concern because the evidence establishes, and there's no genuine issue of material fact, that the speech alleged was not the cause of the termination. Instead, it was the violation of the AUP. So that's the court's decision. He said because he wasn't admonished that there was insufficient evidence. But why isn't it a genuine dispute of material fact as to what the motivation for the termination was? He says it was retaliation for his raising this ethical concern, and the record establishes that he raised an ethical concern. And this, you know, county's response seems to be, well, this was really about private use, and his use was much more extensive than anybody else. And the timing doesn't really make a difference. And, you know, we point to a couple other people who also, you know, used the machine for private use but didn't raise any ethical concerns, except their usage was much less extensive. But why isn't that for a jury to decide? Well, I think that sort of involves a couple of different issues that the court was discussing, a couple of the different causes of action in and of itself. But in terms of why the court decided that it wasn't the causal nexus for the firing, you have Frank Niebusch, who is Mr. Zanama's superior at the time, telling him that it was not the reason for his termination, and he testified to that under oath. I have that in my brief. We have all of the defendants who were deposed saying the same thing. It didn't have to do anything at all with the raising of concerns of client confidentiality. It had to do with the violation of the AUP. So it was an allegation that was disproven by all of the deposition testimony of the people involved. But the declaration as to purpose doesn't really rebut circumstantial evidence. To the contrary, does it? Well, there's no evidence to suggest that the claim that raising ethical concerns about client confidentiality was the reason for the termination. You think he needed something more? I think that the simple straight line reason that he was terminated is based on what's in the record, which is there was a violation of an AUP, that there was a banner on the computer that says, like we all have if we've ever worked in government or for any employer, that an employer has the ability to search our computer for any reason it sees fit, for anything that's a non-authorized use of their resources. They found out from complaints from private citizens that public defenders were doing that. They conducted a search. They found this material. They told the plaintiff along with others not to use their computers for private practice. They ended up finding other apps on Mr. Zanamo's computer regarding client information and billing apps. Found that to be sufficient to find that he needed to be terminated. Can I ask you, so I understand your argument is the temporal proximity alone is not enough. His complaining about access to confidential information coming shortly on the heels of his computer being taken, searched, and then termination two weeks later, that that temporal proximity is not enough because there's evidence in the record that a reason was given. So he, that a reason was given unrelated to the complaint about access to confidential information. How do you respond to his argument? He says disparate treatment and he said there was one person in response, your client says, no, no, there was one other person terminated. There doesn't appear to be any evidence in the record that that person complained about the confidentiality issue and then there were other people who were reprimanded. Now your opponent says today that person really wasn't fired. That person left of their own free will and that the three other people were reprimanded not for conduct that they did after they were told to stop using the computers for personal business. How do you respond to that? To that point, your honor, I'd point out that Mr. Pachente, Mr. Rahill, and Mr. Revere all testified that there was one other person, not Ms. Finer, who either resigned or was terminated. It was like, well, that's a big difference. Either resigned or was terminated is a big difference. But that is what is in the record. And so I cannot. Is it so you concede this person left on their own free will or was it that someone says you're being fired? No, don't fire me. I resign. I'm not conceding it. I would say for purposes of this motion that it's on a summary judgment. If the court were to construe it in the light most favorable to the plaintiff, it could do so without disturbing the decision here. Even if the court was to say, okay, I grant you plaintiff, maybe this person left on their own free will. They still left, whether they were terminated, whether they resigned on their own, whether they quit on their own. One thing about leaving on your own free will, it's another, if I've got the foot on my rear end and I decide I don't want to be fired, I'd rather just resign on my own. So I'm asking you what the record shows. The record shows that from the testimony from those individuals, that he was either terminated or resigned. And if Mr. Zanamo contends that he left on his own free will, I can't disprove that. I can only point to what's in the record, which is definition testimony. Your interpretation of the record is that he was terminated and maybe on the books it shows he resigned, but only because he was going to be terminated. Do you understand what I'm asking? I do understand what you're asking, but I guess my answer to it ultimately is it shouldn't matter. It shouldn't matter whether he was terminated, whether he resigned or whether he left on his own free will after having this issue raised of working on private files while a public defender for this other person. So Mr. Zanamo is raising an issue of disparate treatment. You mean it doesn't matter? I'm trying to understand why it doesn't matter. It doesn't, it wouldn't matter if he resigned because he knew he was going to be terminated, but it would matter if he resigned and no one told him, hey, this is a problem, you're going to get terminated. Do you understand the difference? I don't know why you're saying it doesn't matter. Which one? Why does it not matter? Well, I don't believe it affects the analysis. I'm constrained by the record myself. The deposition testimony states from those three persons that another was either resigned or terminated. Other than that, I cannot rebut Mr. Zanamo's argument in court whether he was, whether this person actually left on their free will. I'm not asking you to rebut his argument. I'm asking you to tell us what's in the record and what the record supports and what inferences the record support. That's what matters to us. In terms of the three people that were, I guess it was three or a few people that were reprimanded. What is in the record and what I cited on page, top of page 15 is their testimony further supports this point as each also testified that at least one other- Let's move on from that point. The point about the people that were reprimanded, not terminated, but reprimanded, okay? What does the record show? Is there a violation of the policy after the notice or prior to? As to other persons? Yes. There's nothing in the record regarding that. There's no discussion in the record one way or the other, nothing that the plaintiff advanced and nothing that the defendants defended on regarding the issues of other persons, not a party to the- So this is a new claim that's being made without a reference to the record, that those violations that supported the reprimand were after the policy was announced. Is that what you're telling us? Yes. It's not in the complaint. It's not supported by the record. It wasn't part of discovery. It's not something that would have made it into the record. So we have this one person that was resigned, terminated, or maybe they left on their own free will. And then you have Mr. Zanamo's partner, Ms. Feiner, who, she was reprimanded. She apologized and she kept her job. If she wanted to leave, I'm sure she could have. She ultimately kept her job, stayed where she was, and declined the precious money for it. What do you mean she was reprimanded? What happened? Was she suspended? Was she given a verbal warning? When you say reprimanded? That's also not something that became part of the record. She wasn't deposed. There's no allegations about what consequence she would have- So where are you drawing that information from? There was some testimony, I believe, and I would have to look in the record. I don't have it up, Your Honor, but some testimony about she apologized and said she wouldn't do it again, and that was that. And I believe for Mr. Zanamo's testimony, that's the same with most of the other public defenders, that they said they wouldn't do it, and they would stop, and they did stop. I believe the difference with him is that there was the greater degree of finding of private practice, along with billing apps and client information apps, that showed a more perverse use of county resources for the practice of law. If there's any other- Your Honors, I am way over my time. If there's any other questions, I'd be happy to answer them. Otherwise, I would rest on the balance of my brief and seek affirmation. Seeing none, thank you, counsel. Thank you, Your Honor. Attorney Zanamo, you have one minute of rebuttal. Thank you, Your Honor. Just briefly, I want to bring up a couple real quick things. First of all, the acceptable use policy that was referenced here, I want to point out something very important, and that's that it exempted any office that had a privilege, including the public defender's office. So I know we got into a whole thing in the papers about Asia Global and the application, or whether it's not- it does not apply in this instance because notice was not appropriately given. I go through that in the brief. In terms of the resignation termination, I think that that's an issue of fact, and I think that the record is indicative of issues of fact as to whether Ms. Feiner was- I'm sorry. With regard to the ITAUP- Yes. So there is the reference to privileged materials, but how does that apply to your use of the machine for private practice of law? So the issue here was whether or not they can search. And so under Asia Global, they're not allowed to even look at the computer unless notice is given. But because it exempted public defender's offices, only the public defender himself could evaluate for that purpose. So he could look and then tell the county executive, hey, by the way, this is what's going on. But the county executive and the county themselves could not access the computer. And my time is up. If there's any other questions. If not, I appreciate it. Seeing none. Thank you, counsel. Thank you, Your Honors. Thank you to both sides. We'll reserve decision.